# CIRCUIT COURT OF THE CITY OF RICHMOND

In re Jasmine Eddings

November 30, 1999

Case No. HK-1769A4

BY JUDGE RANDALL G. JOHNSON

This is a custody dispute between the father and the maternal aunt of Jasmine Monee Eddings, who is ten years old. It is before the court on the father's appeal of an order of the Juvenile and Domestic Relations District Court of the City of Richmond awarding joint custody to the father and aunt, with physical custody to the aunt. A *de novo* hearing was held on November 19.

Jasmine was born on June 9, 1989. At the time of her birth and for a year or so afterwards, her parents, Ronald R. Dickerson and Tracy D. Eddings, lived together with Jasmine and Ms. Eddings' other two daughters, Crystal and Jessica, who are now fourteen and twelve, respectively. Each girl has a different father, none of whom, including Dickerson, was ever married to their mother. When Jasmine was about a year old, her parents separated, with Jasmine and her sisters remaining in the custody of their mother. Later, Ms. Eddings married Richard Lofton, and all three girls lived with Eddings and Lofton.[1] Both before and after Eddings' marriage to Lofton, Dickerson visited with Jasmine, and he paid child support to Eddings. Dickerson testified that after Eddings' marriage, Eddings' attitude toward Dickerson changed, and he was not allowed to visit with Jasmine as often as he had previously. He never went to court to increase his visitation, however, and the evidence is that he and Jasmine saw each other often and got along well.

---

[1] In the interest of clarity, the court will continue to refer to Jasmine's mother as "Eddings" or "Ms. Eddings" even though she assumed the Lofton name after her marriage.

Tina Johnson is Jasmine's maternal aunt. From the uncontroverted evidence presented at the hearing, she and Eddings were extremely close. They lived together for most of their adult lives, both before their respective marriages and after Johnson's divorce. When they were not living together, they visited each other almost every day. Johnson has twin daughters, who are now fourteen, and her daughters and Eddings' daughters have always been more like sisters than cousins.

On December 4, 1998, Eddings, who had serious and prolonged medical problems, died of a heart attack. At first, Mr. Lofton tried to care for her daughters, but the physical and emotional strain was too much, and he had a "breakdown." In January or February, Johnson took the girls to live with her. They have been with her since.

In arguing that he should be awarded full legal and physical custody of Jasmine, Dickerson relies on the well-established rule in Virginia that natural parents are to be favored over nonparents in custody disputes. In *Mason v. Moon*, 9 Va. App. 217, 385 S.E.2d 242 (1989), the court said:

> In all child custody cases, including those between a parent and nonparent, the best interests of the child are paramount and form the lodestar for the guidance of the court in determining the dispute … . In custody disputes between a natural parent and a nonparent, the law presumes the best interest of the child will be served when in the custody of the natural parent … . Based on this presumption, the rights of the [natural] parents may not be lightly severed but are to be respected if at all consonant with the best interest of the child … . To overcome the strong presumption favoring a parent, the nonparent must adduce by clear and convincing evidence that: (1) the parents are unfit; (2) a court previously has granted an order of divestiture; (3) the parents voluntarily relinquished custody; (4) the parents abandoned the child; or (5) special facts and circumstances constitute extraordinary reasons to take the child from the parents.

9 Va. App. at 220 (citations and quotation marks omitted). *See also Bailes v. Sours,* 231 Va. 96, 99, 340 S.E.2d 824 (1986); *Wilkerson v. Wilkerson,* 214 Va. 395, 397, 200 S.E.2d 581 (1973); *Walker v. Brooks,* 203 Va. 417, 421, 124 S.E.2d 195 (1962); *Smith v. Pond,* 5 Va. App. 161, 163, 360 S.E.2d 885 (1987); *Ferris v. Underwood,* 3 Va. App. 25, 28, 348 S.E.2d 18 (1986).

Dickerson argues that Johnson has failed to overcome the presumption in his favor and that custody must be awarded to him. Johnson argues that the

presumption has been overcome and that it is in Jasmine's best interest that custody be awarded to her. The court agrees with Johnson.

The first four factors set out in *Mason* are not applicable here. The court finds that Dickerson is not an unfit parent, although the evidence is that he stopped paying child support in August 1999 and never gave a satisfactory explanation why. The court always finds it interesting, but sad, when a financially-able parent proclaims his or her profound love for a child when that same parent has not made any financial contribution to the child's well-being. In other words, how can a parent love a child when he or she contributes nothing to ensure that the child has something to eat, something to wear, and someplace to live? Still, from all of the evidence presented, the court does not find that Dickerson is unfit. He did pay support from 1990 until August 1999, and he visits regularly with Jasmine. The court will not use a four-month lapse in support, in this particular case, to label the father unfit.

There also has been no previous court order divesting Dickerson of custody, the only previous custody order being the one that is the subject of this *de novo* appeal. Dickerson also never "abandoned" Jasmine; that is, he never "became a total stranger to [his daughter]." *Patrick v. Byerley*, 228 Va. 691, 695, 325 S.E.2d 99 (1985). And while Dickerson did voluntarily relinquish custody of Jasmine when she was about one year old, the relinquishment necessary to deprive a parent of the presumption is relinquishment to a nonparent, not relinquishment to the other parent. *Mason v. Moon, supra* at 222. Dickerson's relinquishment was to Jasmine's mother. The court concludes, however, that there are "special facts and circumstances [that] constitute extraordinary reasons" to award custody to Jasmine's aunt.

*Bailes v. Sours, supra,* was a custody dispute between the mother and the stepmother of Sean. Sean's mother and father had been married, and upon their separation Sean went to live with the father. Sean was then just a little over one year old. Later, after the mother had petitioned the juvenile court for custody, the parents agreed that Sean would continue to live with his father, and the juvenile court entered a consent order awarding custody to the father. At that time, Sean was almost two. After their divorce, both parents remarried. When the father remarried, Sean was three. He continued to live with his father and, after the father's remarriage, with his father's new wife. The father died when Sean was eleven, and Sean continued to live with his stepmother until the custody dispute reached court. Sean was then twelve.

The evidence, summarized by the Supreme Court at 231 Va. 98-99, showed that Sean had developed a "close and loving" relationship with his stepmother. While he had visited at his mother's house every other weekend since his father's death and had what the mother's neighbors called a "good

relationship" with his mother, a psychologist testified that Sean was "very upset" about the prospect of leaving his stepmother and that he had begun wetting his bed and had developed eczema as a direct result of his anxiety over the prospect of living with his mother. Sean also threatened to run away from home if he was forced to leave his stepmother, and the psychologist testified that there was a "good possibility that [Sean] would take [this] action." The psychologist also found that Sean experienced "tension ... when he is with [his mother] and when he speaks to [her] on the telephone." He concluded that forcing Sean to move to his mother's home would have an adverse, harmful impact on Sean and that remaining with his stepmother was in his best interest. The doctor further stated that a change in Sean's custody would create more tension "until he could no longer tolerate the anxiety ... [at which] point, he probably would explode." The psychologist did not rule out suicide, observing that Sean "has had fantasies of joining his father" in death.

Although recognizing the presumption favoring a parent over a nonparent, the trial court concluded that the presumption was neither "conclusive" nor "automatic." 231 Va. at 99. The trial court then found that the presumption had been rebutted "by clear, cogent and convincing evidence that the best interests of Sean demand that he remain in [the stepmother's] custody." *Id*. In affirming the trial court's decision, the Supreme Court said:

> [The mother] argues that the evidence does not establish any of the five recognized factors that would have rebutted the presumption in her favor. She contends that the court merely found that placing custody with [the stepmother] was in Sean's best interest. Considering the evidence relied upon by the trial court in reaching its determination, we can see no practical difference between the finding as stated by the court and a finding of "special facts and circumstances ... constituting an extraordinary reason" for granting Sean's custody to [the stepmother].

231 Va. at 100-101.

Although the facts of the case-at-bar are not as compelling as those in *Bailes*, they are still clear and convincing proof of "special facts and circumstances ... constituting an extraordinary reason for granting [Jasmine's] custody to [her aunt]." Indeed, there is nothing in *Bailes* to suggest that its facts constitute the lower limit for rebutting the presumption under the "special facts and circumstances" factor. Thus, while there is no indication that Jasmine will develop physical ailments if her custody is awarded to

her father, or that she will run away or attempt suicide, there are still extraordinary reasons for awarding her custody to Johnson.

As noted earlier, Jasmine's mother and Johnson were unusually close. They lived together most of their adult lives, both before and after their respective marriages, including the almost nine years between Jasmine's parents, separation and her mother's death. When they were not living together, they visited each other almost daily. Their children were always with them. Jasmine and her sisters and Johnson's daughters were and are like sisters, not like cousins. When Jasmine's mother died and it became clear that Mr. Lofton could not take care of her daughters, it was Johnson, not Dickerson, who came to the rescue. Even now, Jasmine "chases behind" Johnson and is as attached to Johnson, if not more so, than Johnson's own children. Jasmine has made a remarkable adjustment to her mother's death and to her present situation, which the court is sure would not have happened if it were not for the strong love and affection that she has for Johnson and that Johnson has for her. She gets into "the least amount of trouble" of all the girls, and is doing extremely well in school. While Dickerson has done well in keeping in contact and visiting with Jasmine, it just makes no sense, and is certainly not in Jasmine's best interest, to change things now. Jasmine can do no better than she is doing now. She might well do worse.

In making this ruling, the court is not unmindful of the "cramped" living arrangements now experienced by Jasmine and the other members of Johnson's household. Johnson, who is separated from her husband, and the five girls live in a two-bedroom condominium. Johnson sleeps in one bedroom. Four of the girls, not always the same ones, sleep in the other. One girl, sometimes Jasmine, sleeps on the sofa in the living room. In spite of this, there is no evidence that any of the girls dislikes the arrangement or that it is harmful to them. It was also Johnson's testimony that if she is awarded custody of Jasmine, she will sell some stock to purchase or rent larger quarters. The court believes she is sincere and, in any event, does not believe that the present situation is harmful to Jasmine. The totality of the evidence requires that physical custody be awarded to Ms. Johnson. Since she and Dickerson seem to get along well enough to make joint decisions regarding Jasmine's welfare and since the court wants Dickerson to have a substantial say in Jasmine's development, legal custody will be awarded to Johnson and Dickerson jointly.

Mr. Flax is directed to prepare a sketch of an order awarding joint legal custody of Jasmine to Johnson and Dickerson with physical custody to Johnson and which grants Dickerson liberal visitation.